1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

RAYMOND NAVARRO,

        Plaintiff,

        v.

CHAVEZ., et al.,

        Defendants.

Case No. CV 19-1244-MWF (JEM)

REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

The Court submits this Report and Recommendation to the Honorable Michael W. Fitzgerald, United States District Judge, pursuant to 28 U.S.C. Section 636 and General Order 05-07 of the United States District Court for the Central District of California.

## PROCEEDINGS

On February 20, 2019, Raymond Navarro ("Plaintiff"), a state prisoner proceeding pro se and in forma pauperis, filed a complaint under 42 U.S.C. § 1983 against Defendants Chavez, Diaz, and Johnson, correctional officers at California State Prison-Los Angeles County ("CSP-LAC") . (Dkt. No. 1.)  On March 8, 2019, Plaintiff filed a First Amended Complaint.  (Dkt. No. 5.)  On August 2, 2019, Plaintiff filed a Second Amended Complaint ("SAC").  (Dkt. No. 24.)  The SAC dropped the claims against Defendants Diaz and Johnson, leaving Defendant Chavez in her individual capacity as the sole Defendant.

1  Defendant's motion to dismiss the SAC under Fed. R. Civ. P. 12(b)(6) resulted in the
2  dismissal of Plaintiff's request for declaratory relief but was otherwise denied.  (Dkt. Nos.
3  25, 31, 33, 35.)  On June 4, 2020, Defendant filed an Answer.  (Dkt. No. 36.)

4  On September 23, 2021, Defendant filed a motion for summary judgment under Fed.
5  R. Civ. P. 56 ("Motion").  (Dkt. No. 53.)  On September 27, 2021, the Court notified Plaintiff
6  of the requirements for opposing a summary judgment motion.  (Dkt. No. 45.)  The Court
7  granted Plaintiff several extensions of time to file an opposition.  (Dkt. Nos. 56, 58, 61, 64.)
8  On March 2, 2022, Plaintiff filed a short opposition but did not submit any evidence or file a
9  statement of genuine issues.  (Dkt. No. 65.)  Defendant did not file a reply.

10  For the reasons set forth below, the Court recommends that the Motion be granted.

11  **PLAINTIFF'S CLAIMS IN SAC**

12  The action arises out of an assault on Plaintiff on December 10, 2016, by inmate
13  Juan Centeno ("Centeno").  (SAC at 2-3, 5.)  Plaintiff alleges that Defendant laughed when
14  Centeno yelled out threats at Plaintiff's cellmate.  (Id. at 5.)  In response to Centeno's
15  threats, Plaintiff turned off the lights in his cell in order to prevent his cell door from being
16  opened for the evening meal.  (Id.)  Defendant "maliciously opened" the doors to both cells,
17  enabling Centeno to enter Plaintiff's cell with a weapon to stab Plaintiff and his cellmate.
18  (Id.)  Plaintiff tried to subdue Centeno, and Centeno stabbed him.  (Id.)  Officers Diaz and
19  Johnson were unable to stop the attack because Defendant had closed the cell door after
20  Centeno was inside.  (Id.)

21  Plaintiff asserts an Eighth Amendment claim for deliberate indifference to his safety.
22  (Id. at 5.)  After the dismissal of his request for declaratory relief, he seeks only damages.
23  (Id. at 6.)

24  **FACTUAL BACKGROUND**

25  Plaintiff has not submitted any declarations or other evidence and the SAC is not
26  verified.  Accordingly, Plaintiff's version of the events is derived from his testimony at his
27  deposition on June 21, 2021.

28

2

### A.   Undisputed Facts

On December 10, 2016, Plaintiff and Ruben Sada ("Sada") shared a cell next to the cell occupied by Centeno.  (Declaration of T. Chavez, dated September 23, 2021 ("Chavez Decl.") ¶ 16; Transcript of Deposition of Raymond Navarro on June 21, 2021 ("Navarro Depo.") at 13, 20-21.)  Defendant was working in the control booth for their cell block.  (Chavez Decl. ¶ 6; Navarro Depo. at 23.)  While releasing inmates for the evening meal, Defendant opened the doors of Plaintiff's and Centeno's cells; Centeno entered Plaintiff's cell with a weapon and injured Plaintiff and Sada.  (Answer ¶¶ 9-10; Chavez Decl. ¶¶ 17, 26, 32; Navarro Depo. at 43-44,17-18, 50.)  Defendant closed the door to Plaintiff's cell while Centeno was inside with a weapon.  (Answer ¶ 11; Chavez Decl. ¶¶ 26, 28; Navarro Depo. at 52-53.)

### B.   Plaintiff's Version of Events

At his deposition, Plaintiff testified that Centeno started yelling out threats sometime between 3:15 p.m. and 3:30 p.m, "before everybody was locked up for standing count." (Navarro Depo. at 20, 31.)  From his cell, Plaintiff heard "bits and pieces" of the threats, which were directed at his cellmate Sada.  (Id. at 21.)  Centeno called Sada derogatory names and said, "I'm gonna get you," in an angry tone.  (Id.)  He did not make any threats towards Plaintiff.  (Id. at 27.)

Plaintiff saw Defendant walk towards the C Section area of the control booth, look directly towards the area where Centeno was yelling, and give a smile and smirk.  (Id. at 23-25, 48.)  Defendant smiled and smirked while Centeno was loudly threatening Sada.  (Id. at 27.)  Defendant was approximately 30 feet from Plaintiff as he stood at his cell door.  (Id. at 23-24.)

Plaintiff believed that Centeno was going to act on his threats because Centeno had assaulted inmates in the past.  (Id. at 28.)  Plaintiff and Sada agreed to turn off the lights in their cell and skip dinner in order to avoid Centeno until the next day.  (Id. at 33, 51.)

1    Plaintiff turned off the cell lights so that their door would not be opened for meal release.[1]

2    (Id. at 33-34.)  He then went to sleep because he had worked that day and he was very

3    tired.  (Id. at 32-33.)

4         Plaintiff was asleep when his door was opened and Centeno entered.  (Id. at 17, 50.)

5    When he awoke, the cell door was closed with Centeno inside and Sada was defending

6    himself from Centeno, who was stabbing him.  (Id. at 17-18, 53.)  Plaintiff pinned Centeno

7    against the cell door and Centeno stabbed him in the back of the neck.  (Id. at 18-19.)

8         Plaintiff had no prior interactions with Defendant because she was not "a regular" in

9    his cell block.  (Id. at 41.)  He never saw her interact with Centeno.  (Id. at 40.)

10        **C.    Defendant's Version of Events**

11        Defendant's duties as control booth officer included opening and closing cell doors to

12   allow inmates to leave their cells at mealtime and monitoring the inmates as they exited and

13   entered their cells.  (Chavez Decl. ¶¶ 5.)  On December 10, 2016, she was assigned to work

14   in the control booth of Housing Unit One, which was not her usual assignment.  (Id. at ¶¶ 6-

15   7.)  The control booth of Housing Unit One is a square room, enclosed by windows, with a

16   panel in the middle that controls the opening and closing of doors.  (Id. at ¶ 8.)

17        On December 10, 2016, Plaintiff and Sada were housed in Cell 138, and Centeno

18   was housed in Cell 137.  (Id. at ¶¶ 16.)  Defendant never had any interactions with Plaintiff,

19   Sada, or Centeno.  (Id. at ¶ 37.)  As of December 10, 2016, she did not know of any

20   animosity between them or of any propensity for violence on the part of Centeno.  (Id. at

21   ¶¶ 38-39.)  She did not hear Centeno make any verbal threats that day and has no

22   recollection of smiling or smirking while in the control booth.  (Id. at ¶¶ 33, 35.)  If she had

23   heard Centeno make threats towards staff or another inmate, she would have notified the

24   floor staff.  (Id. at ¶ 36.)  From inside the control booth she cannot hear everything that is

25   said on the floor of Housing Unit One unless someone is yelling very loudly.  (Id. at ¶ 20.)

26   _____

27        [1]    Plaintiff testified that the procedure for opening the cell doors to release prisoners for meals
     is that the door is only opened if the cell light is on and the inmate is standing in front of the door.

28   (Navarro Depo. at 41-42.)  Plaintiff referred to Section 554.13 of the operational procedure manual,
     pertinent sections of which are attached as an exhibit to the SAC.  (Id. at 44; see Dkt. No. 24 at 35.)

1      To open and close doors from the control booth of Housing Unit One, Defendant

2  would stand at the panel in the middle of the control booth and push and hold the

3  appropriate button.  (Id. at ¶ 9.)  While standing at the control panel, there were multiple

4  blind spots and her ability to see out of the windows was also hampered by her height.  (Id.

5  at ¶¶ 10-12.)  The blind spots included Cells 136 through 138, and she needed to step away

6  from the panel to see these cells.  (Id. at ¶¶ 11, 13, 15.)

7      At about 6:20 p.m. to 6:25 p.m., Defendant began to open the cell doors in Facility C

8  to release inmates for their evening meal.  (Id. at ¶ 17.)  Her normal practice was to open a

9  specific block of cells and wait 15 to 20 seconds before closing the doors.  (Id. at ¶ 18.)

10  She would check if the lights in a cell were on before opening the doors and she would not

11  open a cell door if the lights were off.  (Id. at ¶¶ 21-22.)

12      Before opening the door to Cell 138, she stepped away from the control panel to see

13  if the lights in the cell were turned on and she saw that they were.  (Id. at ¶¶ 23-24.)  She

14  would not have opened the door to Cell 138 if the lights were turned off.  (Id. at ¶ 25.)  She

15  stepped back to the control panel and opened the doors to Cells 137 and 138, then closed

16  them when she saw inmates outside their cells.  (Id. at ¶ 26.)  She could not see Cells 136

17  through 138 while standing at the control panel.  (Id. at ¶  27.)  Officer Johnson notified her

18  by podium speaker that inmates were fighting in Cell 138 and asked her to open the door.

19  (Id. at ¶ 28.)  She stepped away from the control panel to look at Cell 138, saw movement,

20  and sounded a building alarm.  (Id. at ¶¶ 29-30.)  She was shocked to find out that inmate

21  Centeno had entered Cell 138 and attacked Plaintiff and inmate Sada.  (Id. at ¶ 32.)

22                    **APPLICABLE LEGAL STANDARDS**

23      Rule 56 requires summary judgment to be granted when "the movant shows that

24  there is no genuine dispute as to any material fact and the movant is entitled to judgment as

25  a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S.

26  242, 247-248 (1986).  Material facts are those that affect the outcome of the case.  Id. at

27  248; see also Far Out Productions, Inc. v. Oskar, 247 F.3d 986, 992 (9th Cir. 2001).  A

28

1  dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury

2  could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

3       The moving party bears the initial burden of establishing the absence of a genuine

4  dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the

5  moving party presents sufficient evidence or argument to support the motion, the burden

6  shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Id.

7  at 324; see also Miller v. Glenn Miller Productions, Inc., 454 F.3d 975, 987 (9th Cir. 2006).

8  The nonmoving party must "go beyond the pleadings and by his own affidavits, or by the

9  'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

10  showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting former

11  Rule 56(e)); see also Fed. R. Civ. P. 56(c); Anderson, 477 U.S. at 257. The nonmoving

12  party must "present affirmative evidence in order to defeat a properly supported motion for

13  summary judgment." Anderson, 477 U.S. at 257. With respect to an issue for which the

14  opposing party will have the burden of proof, the movant "can prevail merely by pointing out

15  that there is an absence of evidence to support the nonmoving party's case." Soremekun v.

16  Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007); see Celotex, 477 U.S. at 325 ("t]he

17  burden on the moving party may be discharged by 'showing' – that is, pointing out to the

18  district court – that there is an absence of evidence to support the nonmoving party's case").

19       In ruling on a motion for summary judgment, inferences drawn from the underlying

20  facts are viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus.

21  Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Moreover, the Ninth Circuit has held

22  that the procedural requirements applied to ordinary litigants at summary judgment do not

23  apply as stringently to prisoner pro se litigants. In Thomas v. Ponder, 611 F.3d 1144 (9th

24  Cir. 2010), district courts were cautioned to "construe liberally motion papers and pleadings

25  filed by pro se inmates and . . . avoid applying summary judgment rules strictly." Id. at

26  1150. The Ninth Circuit also has observed that "[a]t the summary judgment stage, we do

27  not focus on the admissibility of the evidence's form. We instead focus on the admissibility

28

1  of its contents." Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which

2  could be made admissible at trial may be considered on summary judgment).

3                                          **DISCUSSION**

4        **A.    Applicable Federal Law**

5        Under the Eighth Amendment, "prison officials have a duty . . . to protect prisoners

6  from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833

7  (1994) (internal quotation marks and citation omitted).  However, "not . . . every injury

8  suffered by one prisoner at the hands of another . . . translates into constitutional liability for

9  prison officials responsible for the victim's safety." Id. at 834.  A prison official violates the

10  Eighth Amendment only when two requirements are met.  Id.  "First, the deprivation alleged

11  must be, objectively, 'sufficiently serious.'" Id. (citation omitted).  For a claim based on a

12  failure to prevent harm, the inmate must show that he was incarcerated "under conditions

13  posing a substantial risk of serious harm." Id.  The Supreme Court in Farmer left open the

14  question of when "a risk of inmate assault becomes sufficiently substantial for Eighth

15  Amendment purposes." Id. at 834 n.3.

16        Second, a prison official must have "a sufficiently culpable state of mind," one of

17  "deliberate indifference to inmate health or safety." Id. at 834 (internal quotation marks and

18  citations omitted).  "[D]eliberate indifference describes a state of mind more blameworthy

19  than negligence" but does not require "acts or omissions for the very purpose of causing

20  harm or with knowledge that harm will result." Id. at 835.  Liability requires a showing that

21  "the official knows of and disregards an excessive risk to inmate health or safety; the official

22  must both be aware of facts from which the inference could be drawn that a substantial risk

23  of serious harm exists, and he must also draw the inference." Id. at 837.  "[A] fact-finder

24  may conclude that a prison official knew of a substantial risk from the very fact that the risk

25  was obvious." Id. at 842.  However, "the obviousness of a risk is not conclusive and a

26  prison official may show that the obvious escaped him." Id. at 843 n.8.  "[A]n official's failure

27  to alleviate a significant risk that he should have perceived but did not, while no cause for

28  commendation," is not a basis for Eighth Amendment liability. Id. at 838.

**B.**   **Analysis**

The facts underlying Defendant's connection to inmate Centeno's assault on Plaintiff are undisputed.  In her role as control booth officer, Defendant opened the doors to Plaintiff's and Centeno's adjacent cells, whereupon Centeno entered Plaintiff's cell with a weapon and injured Plaintiff and his cellmate Sada.  (Answer ¶ 6, 9; 10; Chavez Decl. ¶¶ 16, 26, 32; Navarro Depo. at 17-18, 53.)  Defendant closed the door to Plaintiff's cell after Centeno was inside with a weapon.  (Answer ¶ 11; Chavez Decl. ¶¶ 28, 32; Navarro Depo. at 17, 53.)  As a result, correctional staff could not intervene until Defendant had opened the cell door.

To survive summary judgment, however, Plaintiff must show a genuine dispute of fact regarding whether Defendant knew of the risk posed by Centeno and knew that opening and closing the door to Plaintiff's cell – actions that were part of her normal duties in releasing inmates for the evening meal – presented a substantial risk of facilitating Centeno's attack on Plaintiff and his cellmate.  See Farmer, 511 U.S. at 837.

It is undisputed that Defendant did not regularly work on Plaintiff's cell block, had no interactions with Plaintiff, Sada, or Centeno before December 10, 2016, and had no prior knowledge of Centeno's violent tendencies or any animosity he harbored towards Sada. (Chavez Decl. ¶¶ 37-39; Navarro Depo. at 40-41.)  Plaintiff bases his argument that Defendant knew of the risk posed by Centeno solely on his testimony that earlier in the day she heard Centeno yelling threats at Sada and smiled or smirked in response.  (Navarro Depo. at 23-25, 27, 48.).

Defendant declares that she did not hear Centeno make any threats and has no recollection of smiling or smirking.  (Chavez Decl. ¶¶ 33, 34.)  She further declares that from inside the control booth she cannot hear everything that is said on the cell block floor unless someone is yelling very loudly.  (Id. at ¶ 20.)  Plaintiff has never been in the control booth, but he testified that "you can basically hear every conversation that may go on or anyone yelling out the door in the control booth," citing unspecified "numerous occasions" when control booth staff allegedly pinpointed cells where inmates were yelling or threatening staff.

(Id. at 25, 45.)  He insists that Defendant heard Centeno's threats because he saw her walk "towards the C section side of the control booth," look in the direction where Centeno was yelling threats, and smile or smirk.  (Id. at 23, 25, 48-49.)

Defendant was in an enclosed booth, by Plaintiff's estimate about 30 feet away. (Chavez Decl. ¶ 8; Navarro Depo. at 23.)  There is no evidence controverting her assertions in her declaration about her limited ability to hear what is said on the cell block floor while in the control booth.  (Chavez Decl. ¶ 20.)  Plaintiff's observations of Defendant while Centeno was yelling are insufficient to support an inference that Defendant heard Centeno and sufficiently understood what he was saying to be aware that he was threatening an inmate in Cell 138.  Plaintiff's evidence is not enough to raise a genuine dispute regarding whether Defendant heard Centeno's threats, knew that they were directed at an inmate housed in Cell 138, and drew the inference that the inmates in Cell 138 faced a serious risk of harm if their cell door was opened at the same time as Centeno's.  Farmer, 511 U.S. at 837 (defendant must both "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and must "also draw the inference").

There is a dispute of fact regarding whether the lights in Cell 138 were turned on when Defendant opened the door.  Defendant declares that she stepped away from the control panel to check whether the lights were on in Cell 138 before opening the door and saw that they were.  (Chavez Decl. ¶¶ 21-24.)  She further declares that she would not have opened the door to Cell 138 if the lights had been off.  (Id. at ¶ 25.)  Plaintiff testified that he was asleep when his cell door was opened, but before going to sleep he and his cellmate Sada agreed not to go to the evening meal, and Plaintiff turned off the light so that the door would not be opened for meal release.  (Navarro Depo. at 33-34, 42-43, 51.)  However, this occurred a couple of hours before the door was opened (see Navarro Depo. at 32 ("I knew that chow would not be until another two hours")), Sada was in the cell while Plaintiff was asleep, and there is no declaration from Sada confirming that the lights were still off when

Defendant opened the door.[2]  Nevertheless, viewing the evidence in the light most favorable to Plaintiff, the Court finds a dispute of fact as to whether the lights in Cell 138 were on or off when Defendant opened the door.

Even so, a factual dispute will not preclude summary judgment if it is immaterial. See Anderson, 477 U.S. at 247-48 ("mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact" (emphasis omitted)).  In the absence of evidence that Defendant heard Centeno's threats and knew that they were directed at an inmate housed in Cell 138, opening the door to Cell 138 while the lights in the cell were off, even though against prison policy and Defendant's usual practice, did not show deliberate indifference to the safety of the inmates in the cell.[3]

Nor is there any evidence that Defendant knew that Centeno was inside Cell 138 when she closed the door.  Defendant declares that when she was standing at the control panel, Cells 137 and 138 were in her blind spot and she could not see them while operating the doors.  (Chavez Decl. ¶¶ 10-11, 15, 27.)  She only became aware of the goings-on in Cell 138 when Officer Johnson asked her by podium speaker to open the door because inmates were fighting inside.  (Id. at ¶ 28.)  She stepped away from the control panel to be able to see the cell, saw movement inside the cell, and sounded the alarm.  (Id. at ¶¶ 29-30.)  Plaintiff has not adduced any evidence to the contrary.

Whether Defendant should have been more attentive, or should have done more to compensate for the blind spots that prevented her from seeing Cells 137 and 138 while standing at the control panel, is not relevant to an Eighth Amendment claim.  See Farmer, 522 U.S. at 835 (deliberate indifference requires more than negligence); see also Davidson

---

[2]    At his deposition on June 21, 2021, Plaintiff testified that it had been more than two years since he last spoke to Sada.  (Navarro Depo. at 13.)

[3]    That policy appears to be for the protection of officers on the scene and violating it does not necessarily indicate disregard for an inmate's safety.  (Dkt. No. 24 at 35 ("For safety reason, the cell light will be on before the door is opened so staff can see the inmates and everything within the cell.")).

v. Cannon, 474 U.S. 344, 347-48 (1986) (negligent failure to protect prisoner from inmate assault does not violate Due Process Clause).  Deliberate indifference requires conscious disregard of a substantial risk to an inmate's safety.  Farmer, 511 U.S. at 838; see also Labatad v. Corrections Corp. of America, 714 F.3d 1155, 1157, 1161 (9th Cir. 2013) (affirming summary judgment for defendants who housed plaintiff with member of rival gang who then assaulted plaintiff; although at time of housing assignment defendants knew that plaintiff had recently fought with member of cellmate's gang, plaintiff and cellmate had been in general population together without incident and there was no evidence that defendants "knew of facts supporting an inference and drew the inference of a substantial risk to [plaintiff] if he was placed in a cell with [cellmate]").  Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could not find that Defendant was aware of a serious risk posed by inmate Centeno to the inmates in Cell 138 and consciously disregarded that risk when she opened and closed the doors to the cell for the evening meal.

Accordingly, Defendant's motion for summary judgment should be granted.

## **RECOMMENDATION**

THE COURT, THEREFORE, RECOMMENDS that the District Court issue an Order: (1) accepting this Report and Recommendation; (2) granting Defendant's motion for summary judgment; and (3) directing that judgment be entered dismissing this action with prejudice.

DATED: August 15, 2022                    _/s/ John E. McDermott_
                                                      JOHN E. MCDERMOTT
                                                      UNITED STATES MAGISTRATE JUDGE